### FIRST NAT. BANK OF SHREVEPORT v. CITY NAT. BANK. (No. 5600.)

(Court of Civil Appeals of Texas. Galveston. March 8, 1911. Rehearing Denied June 11, 1914.)

APPEAL AND ERROR (§ 877*)—PERSONS ENTITLED TO ALLEGE ERROR.

In an action against a bank for negligence in making a deposit, where the plaintiff did not set up any claim against a second bank impleaded by the defendant, plaintiff, who was defeated below, cannot complain that the court also found in favor of the impleaded bank.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3560–3572; Dec. Dig. § 877.*]

Appeal from Galveston County Court; Geo. E. Mann, Judge.

Action by the First National Bank of Shreveport against the City National Bank of Galveston, which impleaded the Stockyards National Bank of Ft. Worth. From a judgment in justice court for plaintiff and for defendant over against the impleaded defendant, defendant appealed to the county court, and from a judgment there for defendant, plaintiff appeals. Affirmed.

Questions determinative of the case were certified to the Supreme Court, which answered them in favor of the affirmance. See 166 S. W. 689.

P. A. Drouilhet, of Galveston, for appellant. Stewarts, of Galveston, Geo. T. Burgess, of Dallas, and J. E. Quaid, of Galveston, for appellee City Nat. Bank. Wm. J. Berne, of Ft. Worth, for appellee Stockyards Nat. Bank.

REESE, J. In this case the First National Bank of Shreveport (which will be hereinafter designated as the "Shreveport bank") sued the City National Bank located at Galveston (which will be designated as the "Galveston bank") to recover the amount of three several drafts, aggregating $326.32, less a credit of $135.52, on the Edgewood National Bank, which were sent by the Shreveport bank to the Galveston bank for collection. The suit was instituted in the justice court. The Galveston bank brought in the Stockyards National Bank of Ft. Worth (hereinafter designated the "Ft. Worth bank"), to which it had sent the drafts for collection, and by which they had been sent to the Edgewood bank, and prayed for judgment over and against said bank in case of a recovery against it. A trial in the justice court resulted in a judgment against the Galveston bank in favor of plaintiff, and in favor of the Galveston bank against the Ft.

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

Worth bank. An appeal to the county court resulted in a judgment in favor of the Galveston bank and the Ft. Worth bank, upon a peremptory instruction to the jury. The Ft. Worth bank filed its plea of privilege to be sued in Tarrant county, which was taken under advisement by the county court but was not ruled upon; the court rendering judgment in favor of the bank as to the demand of the Galveston bank against it, upon the rendition of the judgment in favor of the Galveston bank as against the claim of the Shreveport bank. From the judgment the Shreveport bank prosecutes this appeal.

Appellant having made no claim against the Ft. Worth bank, and consequently not being entitled to any relief against it, on its pleadings, cannot complain of the judgment in favor of that bank against the claim of the Galveston bank. The case as presented is limited to the judgment in favor of the Galveston bank as to the claim of the Shreveport bank against it.

It is stated in appellant's brief, and the evidence shows such to be the fact, that the only disputed facts are as to the sending and receipt of two certain letters, one on January 20 or 21, 1909, and the other on October 30, 1908, both of which, it is claimed by appellee, were written and sent by it to the Shreveport bank on the dates named, but which appellant claims never to have received, and evidence in support of such contentions was introduced by the parties respectively. Omitting the facts with regard to the sending and receipt of these two letters, which we do not deem material, the undisputed evidence discloses the following facts:

About May 27, 1908, the Shreveport bank entered into an agreement with the Galveston bank by the terms of which the former was to keep with the latter, on deposit, not less than $50,000 upon which the latter bank was to pay 2 per cent. interest. The Galveston bank was to collect all of the Texas business of the Shreveport bank at par, by which we understand, without expense to the Shreveport bank. In pursuance of this arrangement, appellant sent to appellee daily its Texas collections, aggregating several thousand dollars in amount, and many different items each day. Each day the receipt of these items was acknowledged by appellee on postal cards, using a printed form containing the following statement:

"Due diligence will be observed in the selection of banks or agents for the collection of all papers out of the city, but this bank will not be responsible for the failure or negligence of such bank or agents."

There is no question that this statement was observed by appellant. About the same time a similar arrangement was entered into between appellee and the Ft. Worth bank under which appellee was to keep a certain amount on deposit with the Ft. Worth bank, which was to pay interest on the same, and in consideration thereof to do a similar collecting business for appellee, as to a part of its business in certain territory, free of charge. Under this arrangement it was customary, which custom was general and well understood among bankers, including appellant, to enter a credit of items received from the sending bank, with the understanding that such credits should be canceled if the item was not paid.

On December 2d and 3d, appellant sent to appellee for collection the three small drafts referred to, drawn on the Edgewood National Bank, located at the town of Edgewood in Van Zandt county, Tex. These items were received by appellee and at once entered to the credit of appellant and promptly transmitted by appellee to its correspondent, the Ft. Worth bank. Appellee was instructed to protest these drafts if not paid, and these instructions it transmitted to its correspondent, the Ft. Worth bank. Under the arrangement between these banks referred to, it was not expected by appellant that the cash should be remitted to it, when collected, nor by appellee that such should be done by its correspondent at Ft. Worth. These drafts reached the Ft. Worth bank on the 5th of December, and were by it at once transmitted to the Edgewood National Bank, the drawee, for collection and returns, with instructions to protest if not paid, and reached the Edgewood bank on December 7th, when they were marked, "Paid"; but no returns were made to the Ft. Worth bank, nor, so far as we can find from the evidence, was there any inquiry made by the Ft. Worth bank of the Edgewood bank prior to its failure. In addition to the particular instructions with regard to these drafts, the Edgewood bank had been previously instructed by the Ft. Worth bank to collect and remit promptly all money collected for it. The Edgewood bank failed and closed its doors on January 13, 1909. Its business was wound up by receivers, and a dividend of $135.52 was sent to the Ft. Worth bank, which was transmitted to appellee and by appellee to appellant.

Up to the day of its failure, the Edgewood bank was in good credit and standing and was regarded by banks and bankers and business men generally as a solvent and reliable bank. It was the only bank in the town of Edgewood. There were several reliable banks in towns nearer Edgewood than Ft. Worth, one within seven miles, and others at various distances. Edgewood is nearer Shreveport than Galveston, and there is direct communication between the towns by railroad.

Immediately upon receiving notice of the failure of the Edgewood bank, the Ft. Worth bank, on the 18th or 19th of January, notified appellee. Appellee claims to have at once, on the 19th or 20th of January, written and mailed a letter to appellant notifying it of the

failure, and introduced evidence of this fact; but appellant denied that it had received this letter and supported the denial by testimony. It is, however, undisputed that on February 27th appellant received such notice from appellee. It is stated in appellant's brief that:

"In view of the admitted fact that the Bank of Edgewood failed January 13th, this difference is not material."

On receipt of the drafts by the Ft. Worth bank, it entered the amounts to the credit of the Galveston bank, which credit was canceled upon the failure of the Edgewood bank. The credit to appellant by appellee was carried on its books until some time in March, 1909; but in the letter of February 27th appellee stated that, the drafts not having been paid, the credits would be canceled. In this letter of February 27th appellee called attention to a letter of January written by it to appellant notifying the latter of the nonpayment, but in the reply of appellant to this letter it stated that its records did not show this letter of January.

The undisputed evidence, coming from various bank officials, including the cashier of appellant, shows that at and prior to the transactions in controversy, there was a general custom among bankers in Texas, and elsewhere, that, when one bank sent to another bank items to be collected out of the town or city of the receiving bank, such bank was not expected to collect such item itself, but through other agencies to be selected by it, and that it should not be held responsible for the default or negligence of such agents, but was only required to exercise due care and diligence in such selection, and only responsible to the sending bank for such damages as resulted from its failure in this regard. The bank so selected should be considered the agent of the initial bank and not of the bank from which it received the collection. It was further shown to be the general and recognized custom, when the bank upon which such collections were drawn was the only bank in the town, and was in good credit and standing, to send the collections direct to such drawee bank. This was the custom, notwithstanding the drafts or checks were to be protested upon nonpayment, and in such case it was customary for the drawee bank to protest, if not paid, and this was generally done. The Edgewood bank was the only bank in the town. Express companies would not take collections subject to protest, and it was the general custom for banks and bankers to collect only through other banks. It was also the general custom for banks upon receipt of checks or drafts which, under this general custom, were to be forwarded for collection through other banks, to credit the same to the sender upon receipt, subject to final payment.

The business between appellant and appellee was handled in this way, and appellant's cashier testified to these various customs as general, and as controlling the business of banks with each other, and that in sending the drafts in question it expected that appellee would handle this business in the usual and customary way, and not otherwise.

The trial court charged the jury as follows:

"The undisputed evidence is that the Edgewood National Bank paid the checks to itself as a collecting bank, but never remitted the proceeds to the Stockyards National Bank, the sender, and you will return a verdict for defendant."

Without pausing to criticise the form of the charge, it will be treated simply as a peremptory instruction to return a verdict for the Galveston bank, and, if the evidence presents any issue of fact as to the liability of appellee, the judgment would have to be reversed. For this reason we have set out so fully the result of the undisputed evidence. The only two facts about which there was any controversy are, we think, immaterial. Whether appellee first notified appellant on the 20th of January or the 27th of February of the nonpayment of the drafts, is immaterial, as the Edgewood bank failed on the 13th of January, and it is not shown that any damage resulted to appellant that could have been averted if it had received this notice on the 20th of January instead of the 27th of February.

The assignments of error, which will not be discussed in detail, present several questions of great importance, and upon which we find great conflict of the authorities, relieved, however, to some extent, in so far as this case is concerned, we think, by the facts established by the undisputed evidence.

Was appellee liable for the default or negligence, if any, of the Ft. Worth bank? The courts of the different states of the United States have divided upon this question; some following what is known as the New York rule, and others the Massachusetts rule, the former holding that, when a claim is sent to a bank for collection which requires the intervention of other agencies for such collection, such agencies selected by the receiving bank become its agents, for whose default or negligence it is responsible to the sender. The other rule is to the contrary; that in such case the bank to which the collection is sent is impliedly authorized to select other agents, who thereby become the agents of the sender or depositor; and that the bank with whom the draft, check, or other paper is deposited for collection is required only to exercise due care and diligence in the selection of such agents, and only liable for the consequences of a failure to do so. A clear statement of the two rules of decision with the authorities supporting each is found in Exchange National Bank v. Third National Bank, 112 U. S. 276, 5 Sup. Ct. 141, 28 L. Ed. 722, in which the New York rule is followed. It is, however, stated in the opinion that even in the cases from New York the general liability of banks might be varied and limited by express

agreement of the parties or by implication arising from general usage. It is very clear from the opinion that the general rule followed would not apply when either by express contract or by general usage and custom a different rule of liability was to govern in the transaction of the business.

In support of its contention that the Ft. Worth bank was the agent of appellee, for whose default it was liable, appellant cites the Texas cases of Schumacher v. Trent, from this court, 18 Tex. Civ. App. 17, 44 S. W. 460, and State National Bank of Ft. Worth v. Thomas Mfg. Co., from the Court of Civil Appeals of the Second District, 17 Tex. Civ. App. 214, 42 S. W. 1016. In the first case cited, it was held by this court that:

"When a note is deposited with a bank to be collected at a distant point, where it has no agent or regular correspondent, and it transmits the same to another bank at such point, for collection and return of the proceeds, in the absence of any special agreement between the parties, or custom or usage of bankers having the force and effect of law, which fixes upon the bank with which the deposit is made another measure of liability, such bank, by implication of law, becomes, the agent of the depositor for the collection of the paper, and the bank to which the note is transmitted becomes the agent, not of the depositor, but of the bank with which he made the deposit, and such bank is responsible to the depositor for the default of the collecting bank."

It is further said that:

"A custom to acquire the force of law, and thus modify the general law of agency, must be general as to a particular trade or business, and so well established that any one dealing in that trade is presumed to know it."

It may be doubted as to whether the court was justified in the statement as to the weight of authority being in favor of the rule stated. See statement of both rules and authorities in support of each, 1 Morse on Banking, § 272 et seq. But however that may be, the exception in case of contract or general custom, establishing a different measure of liability, is recognized by the opinion in that case and in every case we have found, where there was evidence of such contract or custom. The opinion in the second of the two cases cited supports the contention of appellant, but in that case there was nothing shown in the way of general custom or contract to warrant the application of a different measure of liability, and it is clearly intimated in the opinion that such general custom, as affording the basis of an implied understanding or agreement, would abrogate the general rule. The case seems to have been ruled upon Bank v. Bank, 112 U. S., supra, which clearly recognizes this principle. 1 Morse on Banks, § 270.

Where nothing is shown but the fact that the paper to be collected must be sent for that purpose to a bank at some other point than the place of payment, whether the law will imply authority to the receiving bank to appoint an agent to collect who shall be the agent of the sending bank, imposing upon the receiving bank no liability for the default of such agent, we need not decide in this case. The weight of authority seems to us to favor what is denominated the Massachussets rule, but the increasing growth of general custom in accordance with this rule probably renders the difference between the two of little practical importance.

Application of these principles to the undisputed evidence in the present case compels the conclusion that the Ft. Worth bank was the agent of appellant, and that appellee is not liable for the negligence, if any, of that bank. The custom referred to was general, and was well known to appellant, and, in addition to such general custom, the notice contained in the several acknowledgments of receipts of items of collection by appellee from appellant, including the drafts in question, accepted by appellant without objection, amounted to a contract on its part that the collections should be made in this way and an acceptance of appellee's conditions that it would only hold itself liable for the exercise of due diligence in the selection of the collecting agent.

Upon this point the witness Bayersdorffer, active vice president and former cashier of appellant, testified:

"Plaintiff first began sending items for collection to defendant on May 27, 1908, and ceased March 19, 1909. Items sent for collection would average 10 to 20 items or more daily. Said defendant acknowledged receipt of said items. The first acknowledgment was on or about May 29, 1908. Said defendant daily acknowledged receipt of practically all items received by it between the 29th of May, 1908, to the middle of March, 1909. There was on said acknowledgments no itemized statement except the receipt of the items, they were by postal cards. All postal cards received during that period were similar to those attached to depositions. All contained these words: 'Due diligence will be observed in the selection of banks or agents for the collection of all paper out of the city, but this bank will not be responsible for the failure or negligence of such banks or agents.' No objection was made to the wording of these postal cards. * * * The defendant did not notify us that they would not personally attend to the collection of said checks; such notice was not necessary, as plaintiff knew that defendant could not collect the items personally from the Bank of Edgewood as that bank was not located in the City of Galveston. All that plaintiff required of said defendant was that it handle the items in the usual and regular course of business. * * * The plaintiff did not expect defendant to handle said items in any other than in the regular course of business." 5 Cyc. 504, and cases cited; Bank & Trust Co. v. Newland, 97 Ky. 464, 31 S. W. 38; Kershaw v. Ladd, 34 Or. 375, 56 Pac. 402, 44 L. R. A. 236.

According to the general custom and the express contract of the parties, appellee was not responsible for the default of the Ft. Worth bank.

Did appellee exercise due care in selecting the Ft. Worth bank as the agent to collect the drafts? No question is made of the solvency and entire reliability of this bank, but it is contended that it was not a suitable

agent for the collection, because appellee knew that it would transmit the drafts to the Edgewood bank, the drawee, and that this was an act of legal negligence which could not be sanctioned by custom no matter how general. The general principle seems to be established by the weight of authority that it is negligence in a bank with whom paper is deposited for collection to send such paper to the person or bank on which it is drawn. 1 Morse on Banks, § 236; First National Bank v. City National Bank, 12 Tex. Civ. App. 318, 34 S. W. 459; Bank of Rocky Mount v. Floyd, 142 N. C. 187, 55 S. E. 95; German National Bank v. Burns, 12 Colo. 539, 21 Pac. 714, 13 Am. St. Rep. 247; Carson, Pirie, Scott & Co. v. Fincher, 129 Mich. 687, 89 N. W. 570, 95 Am. St. Rep. 449; Minneapolis Sash & Door Co. v. Bank, 76 Minn. 136, 78 N. W. 980, 44 L. R. A. 504, 77 Am. St. Rep. 609; Anderson v. Rogers, 53 Kan. 542, 36 Pac. 1067, 27 L. R. A. 248, Givan v. Bank (Tenn. Ch.) 52 S. W. 923, 47 L. R. A. 272.

The testimony, however, shows that the Edgewood bank was the only bank in the town, that appellant knew this fact, that in such cases there was a general custom known to and acted upon by appellant, that the drafts in question would be sent, either by appellee or its correspondent, to that bank direct for collection, that it was the general custom, and, as stated by the witness Bayersdorffer, "the general pratice," for banks to have protested checks drawn on themselves when sent direct to them for collection. In fact, it is shown that appellant understood and expected that these drafts would be sent to the Edgewood bank for collection. How can it then be said that appellee was negligent when it transacted the business in the manner appellant expected and understood it should be done? It was shown that appellant in its own business did the same thing. The precise question was decided by the Supreme Court of Illinois in Wilson v. Carlinville National Bank, 187 Ill. 222, 58 N. E. 250, 52 L. R. A. 632 in which it was held:

"One who deposits for collection a check on a distant bank with knowledge that it is the only bank in the place and that the check will be collected without expense to him through other banks in accordance with banking usages, is estopped from charging the bank in which he deposited it with negligence in sending it to a correspondent who forwards it to the drawee for collection in accordance with the custom in such cases."

In the case of Bank of Corsicana v. Bank of Dallas, 12 Tex. Civ. App. 318, 34 S. W. 458, it is expressly stated that it did not appear that there was any custom or usage which authorized the sending the check to the drawee bank. In fact, the only case we have found stating the broad rule that it is negligence in such cases to send a check or draft for collection direct to the drawee bank, even though there be no other bank in that locality and though it is customary to do so, is the case of American Exchange Bank v. Metropolitan Bank, 71 Mo. App. 451, cited by appellant, and none of the cases cited present the features of this case in respect to the custom, the knowledge thereof by appellant, and the expectation and understanding that the drafts would be sent to the Edgewood bank for collection. We therefore hold that, in the circumstances of this case, appellee was not guilty of negligence in sending the drafts to the Ft. Worth Bank.

It follows that if there was negligence on the part of the Ft. Worth bank, in failing to keep closer track of the draft, and in failing for so long a time to make any inquiry as to why the amount was not remitted, as directed, appellee was not liable therefor. The evidence tended to show that the Ft. Worth bank was negligent in this regard, as it appears that the Edgewood bank was open for business until January 13th, and would have paid these drafts, or remitted the proceeds, if such had been demanded, up to the 13th of January. Having received the drafts for collection on December 7th preceding, it is reasonably clear that proper diligence on the part of the Ft. Worth bank would have resulted in the actual collection of the money. But, as we have said, appellee was not responsible for this default, and, as appellant sought no relief against the Ft. Worth bank, it is remediless in this case.

It seems to be conclusively shown by the testimony that the loss to appellant was not proximately caused by the sending of the drafts to the drawee bank for collection, but by the failure to look more closely after the collection by the Ft. Worth bank. The drafts were received by the Ft. Worth bank on the 5th of December, and by the Edgewood bank on the 7th, two days thereafter. They were marked paid by that bank, and there the matter rested until the 13th of January thereafter, when the Edgewood bank failed. This bank up to the day of failure was regularly engaged in the discharge of its usual functions as a National Bank, and it is entirely clear that, if proper demand had been made by the Ft. Worth bank for the return of this money for these small drafts, the money would have been forthcoming. A week would have been a reasonable time to wait for the return of the money before making further demand, in view of the specific instructions given to the Edgewood bank by the Ft. Worth bank to remit promptly, and can it be doubted, from the testimony, that if this demand had been made and insisted on at the end of a week, which would still have been a month before the bank closed its doors, the money would have been remitted and the loss avoided? We think this is clear, and that therefore the loss may be directly attributed to the failure of the Ft. Worth bank to look more closely after the collection, a result for which appellee is not liable.

It is immaterial that appellee did not soon-

er inform appellant that the credits would be canceled, on account of the failure to collect. Appellee had no notice of the nonpayment until after the failure of the Edgewood bank, and it is not shown that appellant suffered any damage by the delay in canceling the credits. It is clear that this credit was entered subject to be canceled upon failure to collect the drafts. This was in accordance with the course of dealings between the parties.

Counsel for both parties have shown, in the preparation of the briefs and in the citation of authorities, very great industry and close investigation, and we take occasion to acknowledge the very great assistance furnished to the court in the determination of the troublesome questions presented.

We have carefully examined the several assignments of error and propositions thereunder, and have reached the conclusion that none of them presents grounds for reversal. Under the undisputed evidence, no other judgment could have been properly rendered, and the judgment is therefore affirmed.

Affirmed.